**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

MGP INGREDIENTS, INC.,

      Plaintiff,

      v.                                 Case No.  06-2318-JWL

MARS, INCORPORATED and
S&M NUTEC, LLC,

      Defendants.
_____

**MEMORANDUM AND ORDER**

This lawsuit involves the popular Greenies® chew for dogs, which has been sold for years by defendant S&M NuTec LLC (SMN) using, until recently, a formulation containing confidential ingredients supplied by plaintiff MGP Ingredients (MGPI).  In April of 2006, defendant Mars, Incorporated (Mars) acquired SMN.  Plaintiff's complaint generally alleges that Mars destroyed the relationship between SMN and MGPI by treating the agreements between them as unenforceable and by marketing an improved Greenies® dog chew using a purportedly "totally new" Mars formulation.  MGPI alleges that, in doing so, Mars infringed on MGPI's Greenies® formulation patent and misappropriated MGPI's trade secrets.  This matter is before the court on Defendants' Partial Motion to Dismiss (doc. #15).  Therein, defendants ask the court to dismiss MGPI's claims for tortious interference and misappropriation of trade secrets for failure to state a claim upon which relief can be granted.  For the reasons explained below, defendants' motion is denied.

## BACKGROUND[1]

Plaintiff's complaint alleges that for a number of years MGPI has been making ingredients for foods, pet foods, and various other compositions, typically using protein polymers as a base for more complex custom formulations. The exact compositions of these formulations are closely guarded trade secrets of MGPI. SMN was formerly one of MGPI's customers. SMN marketed a popular dog chew named Greenies®. MGPI made the formulation for these products (the "Greenies® formulation") for SMN on an as-needed basis under a confidentiality agreement. The Greenies® formulation includes ingredients covered by an MGPI patent.

In October of 2005, MGPI and SMN entered into a long-term Supply Agreement which essentially provided that SMN would buy all of its needs for the Greenies® formulation from MGPI and that, in turn, MGPI would not sell the Greenies® formulation to anyone else unless SMN's purchases of the Greenies® formulation fell below certain pre-defined limits. At the same time, MGPI and SMN entered into a Confidentiality Agreement which provided that SMN would use MGPI's confidential information solely for doing business with MGPI. They also entered into a Confidentiality Technology Development Agreement which provided for a joint research effort by MGPI and SMN for the purpose of developing an improved Greenies® formulation. The Supply Agreement applied to the

---

[1] The following facts are taken from the allegations in plaintiff's complaint and, consistent with the well established standard for evaluating a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the court assumes the truth of these facts for purposes of analyzing defendants' motion to dismiss.

Greenies® formulation, the improved Greenies® formulation, and to any improvements on either, whether made under MGPI's patent and whether made by MGPI or SMN.

Approximately seven months later, Mars acquired one hundred percent of the stock of SMN in order to give Mars a significant position in the market for dog chew products like Greenies®. Shortly after this acquisition, SMN and MGPI met to discuss and reveal their work to make an improved Greenies® formulation. SMN allowed Mars to have access to the Greenies® formulation improvements. After Mars received confidential information over a period of weeks, it announced to MGPI that it had discovered its own, new formulation for Greenies® (the "Mars formulation"). Mars then began claiming, falsely, that it had invented a "totally new" formulation. Mars represented to MGPI, for example, that a particular component was missing from the Mars formulation when, in fact, according to MGPI, "the opposite was true." (Compl. (doc. #1), ¶ 18, at 5.) Mars also provided MGPI with a list of the components in the Mars formulation, but it would not disclose how much of each component was present. Mars' purpose in claiming that it had a "totally new" formulation was to repudiate the commercial relationship between MGPI and SMN. Mars took the position that neither the Supply Agreement nor the Confidential Technology Development Agreement applied to a situation in which the formulation was a "totally new" Mars-invented formulation. Mars told MGPI that the Supply Agreement did not apply to the Mars formulation and that Mars would provide MGPI the full complement of raw materials for the Mars formulation and only permit MGPI to process those materials into the Mars

3

formulation on a toll basis. Ultimately, SMN ceased purchasing formulations of any kind from MGPI.

In fact, the Mars formulation is based in part on secret ingredients in the Greenies® formulation. The Mars formulation takes advantage of technical advances developed by MGPI and SMN for the improved Greenies® formulation.

Based on these allegations, MGPI asserts claims against SMN and Mars for patent infringement, tortious interference, misappropriation of trade secrets, and breach of contract, and seeks a preliminary and permanent injunction. Defendants now ask the court to dismiss plaintiff's claims for tortious interference (Count II) and misappropriation of trade secrets (Count III) for failure to state a claim upon which relief can be granted. Defendants contend that the tortious interference claim should be dismissed because MGPI has failed to plead that Mars' procurement of SMN's breach was intentional and, additionally, the absence of justification in that a parent corporation cannot tortiously interfere with its subsidiary's contract as a matter of law. Defendants also contend that the misappropriation of trade secrets claim should be dismissed because plaintiff's complaint does not allege that defendants misappropriated anything that would qualify as a valid trade secret.

## LEGAL STANDARD FOR A MOTION TO DISMISS

Dismissal for failure to state a claim upon which relief can be granted under Fed. R. Civ. P. 12(b)(6) is appropriate only when "it appears beyond a doubt that the plaintiff can prove no set of facts in support of [its] claims which would entitle [it] to relief," *Beedle v. Wilson*, 422 F.3d 1059, 1063 (10th Cir. 2005) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)), or when an issue of law is dispositive, *Neitzke v. Williams*, 490 U.S. 319, 326 (1989). The court accepts as true all well-pleaded facts, as distinguished from conclusory allegations, and all reasonable inferences from those facts are viewed in favor of the plaintiff. *Beedle*, 422 F.3d at 1063. The issue in resolving such a motion is "not whether [the] plaintiff will ultimately prevail, but whether the claimant is entitled to offer evidence to support the claims." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (quotation omitted); *accord Beedle*, 422 F.3d at 1063.

## ANALYSIS

For the reasons explained below, the court finds that MGPI's complaint adequately alleges that Mars' interference with the contract was intentional. Additionally, notwithstanding Mars' parent/subsidiary relationship with SMN, MGPI's complaint adequately alleges the absence of justification, or privilege, with respect to the tortious interference claim. The court also finds defendants' arguments concerning MGPI's trade secrets claim to be wholly without merit. Accordingly, defendants' motion is denied.

### A.   **Tortious Interference Claim**

The essential elements of a claim for tortious interference with contract are: "(1) the contract; (2) the wrongdoer's knowledge thereof; (3) his [or her] intentional procurement of its breach; (4) the absence of justification; and (5) damages resulting therefrom." *Burcham v. Unison Bancorp, Inc.*, 276 Kan. 393, 423, 77 P.3d 130, 150 (2003) (quotation omitted). Defendants contend that MGPI has not alleged two of the essential elements of a tortious interference claim.  First, they argue that MGPI has not adequately alleged that Mars' procurement of SMN's breach of contract was intentional.  The court disagrees.  Drawing all reasonable inferences from the well-pleaded facts in plaintiff's favor as of course the court must at this procedural juncture, Mars' procurement of SMN's breach of the Supply Agreement was unquestionably intentional.  According to those allegations, Mars bought SMN, then caused SMN to repudiate its contracts with MGPI by stealing MGPI's confidential information, capitalizing on that information by using it to develop a new formulation.  Mars then attempted to cover up the breach by making false statements to MGPI about the origin of the new formulation.  MGPI specifically alleges that Mars induced SMN to violate the Supply Agreement by not purchasing the Greenies® formulation from MGPI.  Certainly, these allegations evince deliberate conduct by Mars.

Second, and as defendants' primary argument, they contend that Mars, as the parent company of SMN, cannot tortiously interfere with SMN's contractual relationship with MGPI as a matter of law.  This argument goes to the absence of justification for procuring

6

the breach, i.e., element (4) above.[2]  In resolving this issue, absent controlling precedent this court must attempt to predict how the Kansas Supreme Court would decide this matter. *Royal Maccabees Life Ins. Co. v. Choren*, 393 F.3d 1175, 1180 (10th Cir. 2005) (federal court sitting in diversity must apply state law as announced by the highest state court).  The court must "follow any intermediate state court decision unless other authority convinces [it] that the state supreme court would decide otherwise."  *Save Palisade FruitLands v. Todd*, 279 F.3d 1204, 1207 n.1 (10th Cir. 2002).  The court should consider analogous decisions by the state supreme court, decisions of lower courts in the state, decisions of federal and other state courts, and the general weight and trend of authority.  *Progressive Cas. Ins. Co. v. Engemann*, 268 F.3d 985, 987-88 (10th Cir. 2001).  Dicta from the state supreme court represents the court's own comment on the development of state law and "is an appropriate source from which this prediction may be made.  *Carl v. City of Overland Park*, 65 F.3d 866, 872 (10th Cir. 1995).

Because meaningful case law from the state of Kansas does not appear to exist on this issue, the court turns to the decisions of federal and other state courts and the general weight and trend of authority.  In *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752

---

[2] Defendants also raise a separate argument that MGPI has not adequately alleged that Mars' alleged interference was absent justification.  This argument, however, really relates to the same issue of whether MGPI's allegations state a claim concerning whether Mars may have been privileged or justified to interfere with SMN's contractual relation with MGPI. Defendants' primary argument based on the parent/subsidiary relationship is actually subsumed in this element and therefore defendants' second argument is superfluous.

(1984), the Supreme Court discussed the nature of the relationship between a parent corporation and a wholly owned subsidiary corporation:

> A parent and its wholly owned subsidiary have a complete unity of interest. Their objectives are common, not disparate; their general corporation actions are guided or determined not by two separate corporate consciousnesses, but one. They are not unlike a multiple team of horses drawing a vehicle under the control of a single driver. With or without a formal "agreement," the subsidiary acts for the benefit of the parent, its sole shareholder . . . .
>     . . . [I]n reality a parent and a wholly owned subsidiary always have a "unity of purpose or a common design." They share a common purpose whether or not the parent keeps a tight rein over the subsidiary; the parent may assert full control at any moment if the subsidiary fails to act in the parent's best interests.

*Id.* at 771-72. *Copperweld* was an antitrust case, but the court believes the rationale concerning the nature of the relationship between the two corporations applies equally to a tortious interference claim. Thus, this court has previously relied on *Copperweld* in ruling that the agents of a parent corporation, acting within their employment and for the benefit of the parent corporation, cannot be held liable on a tortious interference theory for inducing a wholly owned subsidiary to breach a contract with a third party. *Battenfeld of Am. Holding, Inc. v. Baird, Kurtz & Dobson*, Case No. 97-2336-JWL, 1999 WL 232915, at *4 (D. Kan. Feb. 5, 1999); *see also Starcom, Inc. v. U.S. Telecom, Inc.*, Case No. 87-2540-V, 1991 WL 279291, at *3 (D. Kan. Dec. 11, 1991) (granting summary judgment in favor of defendant on plaintiff's tortious interference claim in light of rationale set forth by Supreme Court in *Copperweld* where defendant and contracting party were subsidiaries of a common parent).

Courts from other jurisdictions have generally held that a parent corporation cannot be held liable for tortious interference when it directs its wholly-owned subsidiary to breach a contract that it is no longer in the subsidiary's economic interest to perform unless the parent corporation employs wrongful means or acts with an improper purpose. *See, e.g.*, *Boulevard Assoc. v. Sovereign Hotels, Inc.*, 72 F.3d 1029, 1036 n.3 (2d Cir. 1995) (collecting case law and noting that courts have "uniformly found that a parent company does not engage in tortious conduct when it directs its wholly-owned subsidiary to breach a contract that is no longer in the subsidiary's economic interest to perform," but recognizing an exception when the plaintiff proves improper motive or improper means); *Phil Crowley Steel Corp. v. Sharon Steel Corp.*, 782 F.2d 781, 783 (8th Cir. 1986) (holding that, under Missouri law, a parent corporation may interfere with its subsidiary's contractual relations to the extent that the parent does not employ wrongful means or act for an improper purpose); *T.P. Leasing Corp. v. Baker Leasing Corp.*, 732 S.W.2d 480, 483 (Ark. 1987) ("[A] parent corporation's privilege permits it to interfere with another's contractual relations when the contract threatens a present economic interest of its wholly owned subsidiary, absent clear evidence that the parent employed wrongful means or acted with an improper purpose."); *cf.* Restatement (Second) of Torts § 769 (1979) (setting forth financial interest privilege for interference with prospective contractual relations). In one of the most recent comprehensive discussions of this issue, the Supreme Court of Tennessee held that a parent corporation has a privilege to cause a wholly-owned subsidiary to breach a contract and, further, that the parent loses its privilege if it acts contrary to its subsidiary's economic interests or employs

9

wrongful means. *See generally Waste Conversion Sys., Inc. v. Greenstone Indus.*, 33 S.W.3d 779 (Tenn. 2000). The court further reasoned that the burden of pleading (and proving) that the defendant parent corporation acted with wrongful means should be on the plaintiff. *Id.* at 784; *see also Speroni S.p.A. v. Perceptron, Inc.*, 12 Fed. Appx. 355, 360-61 (6th Cir. 2001) (following the weight of authority concerning the scope of a parent corporation's liability for tortious interference of a wholly owned subsidiary's breach of contract, and affirming the district court's ruling dismissing the tortious interference claim where the complaint did not allege any wrongful means or an improper purpose on the part of the parent corporation).[3]

Based on the general weight and trend of authority, then, this court predicts that the Supreme Court of Kansas would decide that a parent corporation cannot be held liable for tortious interference when it directs its wholly-owned subsidiary to breach a contract that it is no longer in the subsidiary's economic interest to perform unless the parent corporation employs wrongful means or acts with an improper purpose, and that the plaintiff bears the burden of pleading and proving that the parent corporation employed wrongful means or acted with an improper purpose.

Here, MGPI contends that its complaint states a claim under the exceptions to the general rule that a parent corporation cannot be held liable for tortious interference when it

---

[3] The court is citing this unpublished case for its persuasive value on a material issue in this case.

10

directs its wholly-owned subsidiary to breach a contract.[4]  The court agrees.  This is not a case in which plaintiff alleges only that the parent corporation procured the subsidiary's breach of contract.  Here, MGPI also alleges that the parent corporation, Mars, justified the breach by misrepresenting the Mars formulation as a "totally new" formulation that was outside the scope of the parties' agreements when, in fact, the Mars formulation was based in part on secret ingredients in the Greenies® formulation and took advantages of technical advances developed by MGPI and SMN for the improved Greenies® formulation.  Such misrepresentations of fact could potentially constitute the wrongful means necessary to support a claim against a parent corporation.  *See, e.g.*, *Waste Conversion Sys.*, 33 S.W.3d at 784 (what constitutes "wrongful means" in this context generally includes acts which are wrongful in and of themselves such as fraud, "misrepresentations of fact," threats, violence, intimidation, etc.); *cf.* Restatement § 767 cmt. c (listing misrepresentations as a wrongful means of interference) and § 769 cmt. d (referring to the wrongful means set forth in § 767 cmt. c).  The parties have not submitted briefs which seek to explore the exact parameters of

---

[4] MGPI raises this argument with respect to Mars' alleged conduct after its acquisition of SMN's stock.  MGPI also contends that it may assert a tortious interference claim based upon Mars' conduct prior to its acquisition of SMN's stock, presumably meaning in the absence of wrongful means or an improper purpose.  MGPI's argument in this respect is fundamentally flawed, however, because its complaint does not allege any facts from which it could be inferred that Mars interfered with the Supply Agreement before it acquired SMN.  Rather, the allegations in the complaint indicate that Mars did not have access to MGPI's confidential information until after it acquired SMN, and also that SMN's breach of the Supply Agreement did not occur until after Mars acquired SMN.  In any event, the court finds that MGPI's complaint states a claim for tortious interference even under the legal standard applicable to a parent/subsidiary relationship.

what constitutes wrongful means in this context, and the court will confine its analysis accordingly. Suffice it to say at this procedural juncture that defendants have not shown that it appears beyond a doubt that MGPI cannot prove any set of facts which would entitle it to relief against Mars. Consequently, defendants have not shown that they are entitled to dismissal on this basis.

**B.    Misappropriation of Trade Secrets Claim**

Defendants ask the court to dismiss MGPI's misappropriation of trade secrets claim because, defendants contend, MGPI has failed to plead an adequate trade secret under the Kansas Uniform Trade Secrets Act ("KUTSA"). Defendants' rationale is that MGPI's alleged trade secrets are either (1) not owned by MGPI, and therefore not actionable; (2) disclosed by MGPI's patent, and therefore generally known; or (3) described in vague or conclusory terms that fail to satisfy Rule 8 of the Federal Rules of Civil Procedure. The court finds that this argument is wholly without merit because it misconstrues and mischaracterizes the allegations in MGPI's complaint.

The Kansas Uniform Trade Secrets Act (KUTSA) defines a trade secret as, among other things, information that derives independent economic value from not being generally known to or readily ascertainable by others. K.S.A. § 60-3320(4)(i). Defendants' argument is that the Supply Agreement reveals that the original Greenies® formulation was comprised of two confidential SMN ingredients (which, therefore, were not MGPI's trade secrets) combined with MGPI's resin formula which does not constitute a trade secret because it is patented and, hence, generally known to others. In response, MGPI does not seem to dispute

defendants' argument that MGPI does not have standing to assert a trade secrets claim with respect to the confidential ingredients that SMN contributed to the Greenies® formulation or that MGPI's patented resin formula is generally known to others and thus not entitled to trade secret protection.  Instead, MGPI points to the allegations concerning confidential information exchanged by MGPI and SMN during their joint efforts to develop a replacement formula.  MGPI points out that the complaint alleges that SMN gave Mars access to the Greenies® formulation improvements (Compl. (doc. #1), ¶ 16, at 4) and that Mars developed its purportedly "totally new" formulation which, in fact, took advantage of technical advances that MGPI and SMN developed for the improved Greenies® formulation (*id.* ¶ 22, at 5).  Under the terms of the Confidential Technology Development Agreement, MGPI and SMN were to own the Greenies® formulation improvements on a 50/50 basis, thus indicating that these improvements should not have been generally known to or readily ascertainable by others, such as Mars.  Based on these allegations, the court has no difficulty concluding that plaintiff has set forth sufficient factual allegations from which it can be inferred that the information Mars allegedly misappropriated constituted a trade secret.  Consequently, it does not appear beyond a doubt that MGPI can prove no set of facts under which it would be entitled to relief on its trade secrets claim.  Accordingly, this aspect of defendants' motion to dismiss is also denied.

   **IT IS THEREFORE ORDERED BY THE COURT** that Defendants' Partial Motion to Dismiss (doc. #15) is denied.

13

**IT IS SO ORDERED** this 7th day of December, 2006.

s/ John W. Lungstrum
John W. Lungstrum
United States District Judge